UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EXPORT DEVELOPMENT CANADA as subrogee of NORTHCOAST TRADING LTD., and NORTHCOAST TRADING, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> GLOBALONE FOREST PRODUCTS, INC., <br><br> Defendant. | No. 07 C 2127 <br><br> Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs in this case are Northcoast Trading Ltd. ("Northcoast"), a Canadian based company involved in the buying and selling of lumber and lumber products, and Export Development Canada, Northcoast's subrogee. Defendant Global One Forest Products, Inc. ("Global One") is a Chicago-based company also in the business of buying and selling lumber and lumber products. Plaintiffs filed this action for payment for certain lumber products it shipped to Defendant pursuant to a purchase order. They now move for summary judgment on their claims of breach of contract and account stated. For reasons set forth here, the motion is denied.

### FACTS[1]

Northcoast is a Canadian corporation in the business of buying and selling lumber and lumber products. (Pltf. 56.1(b) ¶¶ 6-7.) Alfred Loewen is the president of Northcoast. (Pltf. 56.1(b)

---

[1] The facts presented here are based on Plaintiffs' Statement of Undisputed Material Facts ("Pltf. 56.1(b)"), Defendant's Response to Plaintiffs' L.R. 56.1(b) Statement of Facts ("Def. 56.1(b) Resp."), Defendant's L.R. 56.1(b) Statement of Additional Material Facts ("Def. 56.1(b) Add'l Facts"), and Plaintiffs' Response to Defendant's Statement of Additional Material Facts ("Pltf. 56.1(b) Resp."). The court also cites the deposition of Alfred Loewen ("Loewen Dep."), attached as Exhibit 1 to Defendant's Memorandum; the deposition of Simon Lehtman ("Lehtman Dep."), attached as Exhibit B to Plaintiff's Statement of Undisputed Material Facts; the affidavit of Alfred Loewen (Loewen Aff.), attached as Exhibit A to Plaintiff's Statement of Undisputed Material Facts; and the affidavit of Simon Lehtman ("Lehtman Aff."), attached as Exhibit 1 to Defendant's Memorandum.

¶ 8).  Global One is incorporated in Illinois and has its principal place of business in Chicago. (Lehtman Dep. at 33-35; Pltf. 56.1(b) ¶¶ 3, 56.)  Simon Lehtman is the president of Global One. (Lehtman Aff. ¶ 1.)  Although, as discussed below, Defendant contends that certain earlier transactions are relevant here, it is undisputed that the transaction at issue in this case was the first business contact between the corporate parties to this lawsuit, and that it was brokered by Lenny Popok. (Pltf. 56.1(b) ¶19; Loewen Dep. at 27-31; Lehtman Dep. at 45-48.)  Popok, whom Loewen had known for ten to twelve years (Loewen Dep. at 31), was an independent sales agent who represented Northcoast, though he had no authority to negotiate independently on Northcoast's behalf. (Plaintiff's Amended Answers to Defendant's First Set of Interrogatories, Ex. 4 to Defendant's Memorandum; Pltf. 56.1(b) ¶ 18.)  Popok approached Loewen in 2005 to discuss the possibility of selling Northcoast's products. (Pltf. 56.1(b) ¶¶ 14-18.)  Northcoast asserts that Popok brought several proposals to Northcoast, but the transaction with Global One was the only business that Mr. Popok successfully negotiated. (Loewen Dep. at 29; Pl. L.R 56.1(b) ¶¶ 16-17).

Loewen testified that he first received a fax from Global One requesting a proposal of profiles and prices for products in Northcoast's inventory, and that Northcoast submitted a response to Global One.  At his deposition, Loewen was unable to recognize the date of the fax but guessed that Northcoast had received it in November 2005. (Loewen Dep. at 34-35.)  According to Loewen, Global One corresponded through Popok that Northcoast's proposed prices were too high, and Loewen directed Popok to ask Global One for a counteroffer.  (*Id.* at 36-37.)  At some point subsequent to this exchange, Loewen recalls that the parties reached an agreement on price, and Loewen directed Popok to ask Global One for a purchase order.  (*Id.* at 38-40.)  Upon receiving what he characterizes as the purchase order, Loewen testified, he made a phone call to Global One, using the phone number listed on the purchase order, and spoke with a gentleman named Mohammed, who confirmed that Global One had issued the purchase order and that the prices and products listed were correct.  (*Id.* at 41-42.)  Although Loewen does not recall obtaining

Mohammed's last name, he does recall that Mohammed confirmed that he was the person negotiating the business for Global One. (*Id.* at 44-45.) Loewen did not speak to anyone else at Global One. (*Id.* at 48.) Loewen testified that he had two subsequent phone conversations with Mohammed in order to settle on terms of payment, and finally confirmed the business with Global One in the third phone conversation, after he had checked Global One's credit. (*Id.* at 45-48.) Northcoast then shipped the goods requested in the purchase order in three separate truckloads and sent invoices for each of the three shipments. (*Id.* at 49, 52; Loewen Aff. ¶ 14.) Loewen claims that after receiving the invoices, someone at Global One–Loewen did not know who–contacted Northcoast's controller to request an extension as the payments were coming due. (Loewen Dep. at 53-54.)

Northcoast has not received payment for the goods identified in the invoices, and Plaintiffs (Northcoast and its subrogee, Export Development, who insured the account receivable) claim that the principal balance owing to them for the goods shipped is $95,780.25 plus accrued interest (Loewen Aff. ¶¶ 17, 19, 21-23.)

Defendant Global One acknowledges it received the goods identified in the invoices (Def. 56.1(b) Resp. ¶ 32), but its account of the events resulting in that shipment bears no resemblance to Plaintiffs' version. According to Global One, the document to which Plaintiffs refer as a purchase order was no more than a list prepared by Global One's president, Simon Lehtman, who claims he did not send the document to Northcoast. (Def. 56.1(b) Resp. ¶¶ 21, 23.) Global One contends the goods that Northcoast delivered were replacement goods – shipped to fulfill a previous contract in which Global One's predecessor, P.L. Porcelain Laboratories, paid money but never received the products it ordered. Simon Lehtman's father, Philip Lehtman, was the owner and president of Porcelain; Simon Lehtman acted as the company's general manager. (Lehtman Dep. at 11-12.) Porcelain had been formed as a dental laboratory, but according to Lehtman, an individual named Dmitri Belokopytov approached the Lehtmans in 2002 and persuaded them to enter the lumber

products market. Through Belokopytov, the Lehtmans placed an order for various wood products with a company called Maher Forest Products, Ltd. ("Maher"). (Lehtman Dep. at 13-15, 25.) The Lehtmans understood that Belokopytov was soliciting business on behalf of Maher, and that Belokopytov would sell the raw materials to Maher, who would then send the finished goods to the Lehtmans for them to sell. (Lehtman Dep. at pp.15, 18, 91.) Belokopytov proposed a deal in which there would be three shipments of goods; Belokopytov would accept payment for the goods and would, in turn, transmit the funds to Maher. (Lehtman Aff. ¶¶ 4-6.) The Lehtmans received the first shipment from Maher, but Maher claimed it had not received payment for any of the goods and refused to deliver the second and third shipments. (*Id.* at ¶ 7.) Phillip Lehtman made an additional payment directly to Maher, but Maher nevertheless insisted that additional payments were still due, and the Lehtmans never received the second and third shipments. (*Id.* at ¶ 8.) The matter was never resolved. (Lehtman Dep. at 27-28.) Within the next year, Philip Lehtman helped found Global One, and upon its founding, named Simon Lehtman its president. (Lehtman Dep. at 8.)

According to Defendant, what connects this prior transaction to the transaction at issue in this case is the fact that Popok and Loewen were involved in both transactions. Lehtman testified that Popok was the Lehtmans' intermediary with Terry Maher and Belokopytov. (Lehtman Dep. at 21-22). Defendant notes that the original invoices from Maher identify Loewen as a salesman, and e-mail correspondence between Terry Maher and the Lehtmans also reflect Loewen's involvement in the transactions. (Def. 56.1(b)Additional Facts ¶ 2.) According to Lehtman, Global One had no direct contact with either Northcoast or Loewen. (Lehtman Dep. at 44-45.) In fact, Lehtman insists, he had never heard of Northcoast until Global One received invoices from Northcoast. (*Id.*) Lehtman claims Popok approached him (the court presumes this was prior to December 2005) and told him that he could make arrangements to provide Global One with the products it had purchased but never received. (Lehtman Dep. at 47-48.) Aware that Popok was involved in the earlier transactions, Lehtman accepted Popok's proposal in the belief that Global One would be

4

receiving the product for which it had already paid. (Lehtman Dep. at 83). Lehtman recalls Popok telling him that Loewen (whom Lehtman recalled from his earlier dealings with Maher) was in possession of the inventory. (Lehtman Dep. at 45, 6.) Thus, Lehtman explained, "[Popok] knew the money [Lehtman] had provided and what they were supposed to receive, and [Lehtman] assumed that [Popok] knew the goods were laying in Al Loewen's possession, and somehow they put this plan together in order to get rid of them." (Lehtman Dep. at 84.)

Lehtman complied with Popok's instructions: Lehtman first provided Popok with an initial written request with attention to Loewen, and later provided a formal request, listing the goods he expected to receive. At Popok's direction, Lehtman set a price for the goods, but kept the total below $100,000, purportedly in order to permit Loewen to "write off" the transaction as a loss. (Lehtman Dep. at 45, 64, 50-51.) The deal made sense, Lehtman testified, because Loewen had had some involvement in the earlier transaction, and therefore knew that Lehtman had already paid for the materials. Moreover, Lehtman observed, by the time the parties negotiated this second deal, the materials at issue had little value in the marketplace and Loewen was likely unable to dispose of them. (Lehtman Dep. at 81-82.) Lehtman says he gave the document that Plaintiffs characterize as a purchase order to Popok and no one else. (*Id.* at 56.) The document is not addressed to any recipient, and Lehtman did not know what Popok intended to do with it. (Lehtman Dep. at 64.) Lehtman testified that he never spoke to Loewen and that he (Lehtman) "is the company" – that is, there are no other sales personnel, no directors, and no other staff, and Lehtman himself deals directly with others on Global One's behalf. (Lehtman Dep. at 37-39.) In his affidavit, Lehtman stated that no person named Mohammed or calling himself by that name has ever been employed by Global One. (Lehtman Aff. ¶ 15.)

Lehtman acknowledges that Global One received the goods and did not pay Northcoast. He testified that when he received Northcoast's invoices, Lehtman assumed the invoices were a formality required to enable Loewen to write off the shipment as a loss. (Lehtman Dep. at 74.)

Lehtman testified that the products Global One received from Northcoast in 2006 are the same products identified in the invoices that Maher issued to Porcelain in 2003. (Lehtman Dep. at 78.) Lehtman had never heard of Northcoast before he received the Northcoast invoices; his first contact with Northcoast was a phone call from an individual whose first name was Peter [presumably, Peter Loewen], who inquired about payment. (Lehtman Dep. at 46, 75.) Lehtman responded that there would be no payment because the goods were covered by past consideration. (*Id.*) Lehtman testified that he received no other correspondence after the initial contact from Peter Loewen, and only realized that Northcoast was actually expecting payment when this lawsuit was filed. (Lehtman Dep. at 76.) When he asked Popok why Northcoast had filed the lawsuit, Lehtman recalls, Popak answered by telling him that "basically the insurance company [presumably Plaintiff Export Development Canada] was forcing AI to do it." (Lehtman Dep. at 79-80.)

Neither party has offered any testimony or affidavit from Popok or from Belokopytov.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, presents no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Keck Garrett & Assocs., Inc. v. Nextel Comms., Inc.*, 517 F.3d 476, 483-84 (7th Cir. 2008). To defeat this motion, Defendant must demonstrate that there are disputes of fact concerning one or more of the elements of the case that Plaintiff must prove at trial. The court will construe the facts in the light most favorable to Defendant, and draw all reasonable inferences in its favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir.2004). In deciding this motion, the court does not evaluate the weight of the evidence, judge the credibility of witnesses, or determine the ultimate truth of the matter. *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

### II. Breach of Contract Claims

Plaintiffs claim that an enforceable contract existed between Northcoast and Global One and Global One breached that contract. In determining whether a valid agreement arose between the parties, the court looks to state law. *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997). Following the parties' lead, the court assumes that Illinios law governs this dispute concerning payment for goods delivered in Illinois.

In order to establish a breach of contract claim under Illinois law, a plaintiff must demonstrate: "(1) an offer and acceptance; (2) consideration; (3) definite and certain terms of the contract; (4) plaintiff's performance of all required contractual conditions; (5) defendant's breach of the terms of the contract; and (6) damage resulting from the breach." *Barille v. Sears Roebuck & Co.*, 289 Ill. App.3d 171, 175, 682 N.E.2d 118, 121 (1st Dist. 1997). In arguing that these elements are met, Plaintiffs rely primarily on *Fabrica De Tejidos Imperial, S.A v. Brandon Apparel Group, Inc.*, 218 F. Supp. 2d 974, 977 (N.D. Ill. 2002), where the court cited the relevant portions of the Uniform Commercial Code, codified in Illinois:

> [A]n order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods . . . .

218 F. Supp. 2d at 977 (quoting 810 I.L.C.S. 5/2-206(b)). In *Fabrica De Tejidos,* all of the purchase orders at issue had been approved by defendant's CEO and listed the plaintiff's name and address. *See Fabrica De Tejidos*, 218 F. Supp. 2d at 976-77. The court noted, further, that ten of the fourteen purchase orders were specifically directed to the plaintiff, listing plaintiff's name in two places, while the remaining four purchase orders identified plaintiff as the factory ordered to produce the goods. *Id.* at 977 n.8. The court concluded that defendant had sent valid purchase orders to the plaintiff seller, and that plaintiff's prompt response created an enforceable agreement.

In *Fabrica De Tejidos,* the combination of defendant's valid purchase order, plaintiff's prompt shipment pursuant to that purchase order, and defendant's receipt of that shipment provided sufficient grounds for a finding of offer, acceptance, and seller's performance. In this case,

7

Defendant Global One argues that the document on which Plaintiffs rely, admittedly created by Simon Lehtman, was never intended as a purchase order. In support, Defendant points to the fact that the document was never directed to Northcoast and identifies no addressee at all; instead, it was nothing more than a list that Defendant gave to Popok.

In concluding that the contested documents constituted a purchase order in *Fabrica De Tejidos,* the court looked to the signature of the buyer's CEO in conjunction with the specific listing of seller's address. Here, in contrast, the document at issue bears no markings reflecting fax transmission to Northcoast, nor do Plaintiffs offer any evidence that Northcoast received this document directly from Global One. Lehtman testified in his deposition that he did not know that a company named Northcoast existed until he received the invoices. The court notes, in addition, that the purchase order on which Plaintiffs rely in this case contains nothing in the way of shipment instructions; if the buyer in this case understood the document as binding it to pay for goods worth $96,000, one would expect such instructions.

Plaintiffs insist that Loewen's testimony establishes that the parties engaged in negotiations subsequent to the receipt of the purchase order and prior to the shipment of goods, and that there were payment negotiations after Global One received the shipment. (Reply at 12.) Defendant denies this, and Lehtman, Global One's president, insists the company does not employ anyone named "Mohammed," the individual with whom Loewen claims the purported negotiations took place. (Lehtman Aff. ¶15.) This court will not use summary judgment to resolve a swearing contest between the litigants. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In sum, there is a genuine issue as to whether Global One sent a purchase order to Northcoast thereby creating a enforceable agreement between Global One and Northcoast. When there is a factual dispute, the question of whether a contract exists is for the jury to decide. *Mulliken v. Lewis*, 245 Ill. App.3d 512, 516, 615 N.E.2d 25, 28 (4th Dist. 1993).

**III.    Account Stated Claim**

Illinois law defines an "account stated" claim as based on "an agreement between the parties who had previous transactions that the account representing those transactions is true and the balance stated is correct, together with a promise, express or implied, for the payment of such balance." *Fabrica De Tejidos Imperial,* 218 F. Supp. 2d at 977 (quoting *W.E. Erickson Constr., Inc. v. Congress-Kenilworth Corp.,* 132 Ill. App.3d 260, 267, 477 N.E.2d 513, 519 (1st Dist. 1985). Furthermore, Illinois state courts have characterized an "account stated" as "'merely a form of proving damages for the breach of a promise to pay on a contract'." *D.S.A. Finance Corp. v. County of Cook*, 345 Ill. App.3d 554, 560, 801 N.E.2d 1075, 1080 (1st Dist. 2003) (quoting *Dreyer Medical Clinic, S.C. v. Corral*, 227 Ill. App.3d 221, 226, 591 N.E.2d 111, 114 (2nd Dist. 1992). The only testimony relating to Plaintiff's "account stated" theory is Loewen's hearsay account of a request from Global One for an extension of time to pay the three 2006 invoices. Because the court denies Plaintiff's motion for summary judgment on the breach of contract claim, it necessarily denies motion for summary judgment on the claim for account stated.

## **CONCLUSION**

There remains a genuine issue of fact as to whether Plaintiff Northcoast and Defendant Global One entered an enforceable contract. Plaintiff's motion for summary judgment [30] is denied.

ENTER:

Dated: September 22, 2008

_____
REBECCA R. PALLMEYER
United States District Judge

9